1

2

3

4          UNITED STATES BANKRUPTCY COURT

5          IN AND FOR THE DISTRICT OF ARIZONA

6

7  In Re                              )    Chapter 11 Proceedings
                                      )
8  TODD McFARLANE PRODUCTIONS,        )
   INC.,                              )    Case No. BR-04-21755-PHX-CGC
9                                     )
          Debtor.                     )    Adv. No. 06-804
10 _____)
                                      )
11 HANOVER INSURANCE COMPANY,         )
                                      )    UNDER ADVISEMENT
12          Plaintiff,                )    DECISION RE:
                                      )    1) THE MCFARLANE INSUREDS'
13 v.                                 )    MOTION FOR PARTIAL SUMMARY
                                      )    JUDGMENT AGAINST GENERAL STAR
14 TMP INTERNATIONAL, INC., et al.,   )    INDEMNITY COMPANY REGARDING
                                      )    ITS UMBRELLA INSURANCE POLICY
15          Defendants.               )    (COUNT VI)
                                      )    2) GENERAL STAR INDEMNITY
16                                    )    COMPANY'S CROSS-MOTION FOR
                                      )    PARTIAL SUMMARY JUDGMENT
17                                    )    AGAINST TODD MCFARLANE AND
                                      )    TODD MCFARLANE PRODUCTIONS,
18                                    )    INC.
                                      )    3) GENERAL STAR INDEMNITY
19                                    )    COMPANY'S MOTION FOR SUMMARY
                                      )    JUDGEMENT AGAINST TMP
20                                    )    INTERNATIONAL, INC. AND
                                      )    MCFARLANE ENTERTAINMENT, INC.
21                                    )    4) THE MCFARLANE INSUREDS'
                                      )    MOTION FOR PARTIAL SUMMARY
22                                    )    JUDGMENT AGAINST THE HANOVER
                                      )    INSURANCE COMPANY AND
23                                    )    CITIZENS INSURANCE COMPANY OF
                                      )    AMERICA
24                                    )    5) JOINT CROSS-MOTION FOR
                                      )    PARTIAL SUMMARY JUDGMENT
25                                    )    FILED BY THE HANOVER INSURANCE
                                      )    COMPANY AND CITIZENS
26                                    )    INSURANCE COMPANY OF AMERICA
   _____)
27

28 I.  Introduction

          Before the Court are the following related motions and cross motions for summary

judgment, some of which were originally filed in the District Court for the Eastern District of Missouri before being transferred to the District of Arizona and this Court:

- The McFarlane Insureds' Motion for Partial Summary Judgment Against General Star Indemnity Company ("General Star") Regarding Its Umbrella Insurance Policy (Count VI) (Docket 136, E.D. Mo.)

- General Star's Cross Motion for Partial Summary Judgment Against Todd McFarlane ("McFarlane") and Todd McFarlane Productions ("Productions") (Docket 88, Bankr. Az.)

- General Star's Motion for Summary Judgment Against TMP International, Inc. ("International") and McFarlane Entertainment (Docket 89, Bankr. Az.)

- The McFarlane Insureds' Motion for Partial Summary Judgment Against Hanover Insurance Company ("Hanover") and Citizens Insurance Company of America ("Citizens") (Docket 130, E.D. Mo.)

- Joint Cross Motion for Partial Summary Judgment Filed by Hanover and Citizens (Docket 223, E.D. Mo.)

This is an insurance coverage dispute arising out of a $15 million judgment against McFarlane and Productions in favor of Tony Twist ("Twist"). The original lawsuit ("The Twist Litigation") was brought in Missouri in 1997 by Twist against Defendants International, Productions, and McFarlane (collectively referred to hereinafter as "the McFarlane Insureds") and others alleging claims for appropriation of name and likeness, defamation, unjust enrichment, misappropriation and civil conspiracy.

Hanover brought this action seeking a declaratory judgment that it had no duty to defend or indemnify the McFarlane Insureds in the Twist Litigation; the McFarlane Insureds counterclaimed seeking damages for the breach by Hanover of its duty to defend and to indemnify and brought a third party claim against Citizens and General Star.

The McFarlane Insureds seek partial summary judgment against Hanover and Citizens on all liability issues in Counts I and II of the First Amended Counterclaim and Third Party Complaint. The McFarlane Insureds allege in Count I that Hanover and in Count II that Citizens each breached its contractual duties under its respective insurance policies, resulting in the McFarlane Insureds having to defend themselves at great expense in the underlying Twist Litigation, being unable to enter into meaningful settlement negotiations in the underlying Twist

1 Litigation, and being exposed to crippling liability in the underlying Twist Litigation, all of which
2 has resulted in Productions having to seek Chapter 11 protection.

3   Hanover and Citizens cross move for summary judgment against the McFarlane Insureds
4 on all Counts of the McFarlane Insureds' First Amended Counterclaim and Third Party Complaint
5 relating to them, specifically: 1.  Counts I and II as just discussed; 2. Count III alleging a breach
6 of contract claim jointly against Hanover and Citizens relating to policies issued to International;
7 3. Counts VIII and IX jointly alleging claims of bad faith against Hanover and Citizens; and 4.
8 Count X alleging a civil conspiracy claim against Hanover and Citizens.

9   The McFarlane Insureds also seek partial summary judgment against General Star on
10 liability issues in Count VI of the First Amended Counterclaim and Third Party Complaint for
11 breach of General Star's commercial umbrella policy for the policy dates of May 1, 1994, to June
12 1, 1998.  Count VI is identical to Counts I (Hanover) and II (Citizens) except that it relates solely
13 to the General Star Umbrella Policy.   General Star in turn cross moves for partial summary
14 judgment against McFarlane and Productions on Counts V, VI and VII of the First Amended
15 Counterclaim and Third Party Complaint.  Counts V and VII are identical to the breach of contract
16 counts in Count VI except that they relate to General Star's Multi-Media Policy and Excess Policy
17 respectively.  By separate summary judgment motion, General Star also seeks summary judgment
18 against International and McFarlane Entertainment for Counts V, VI and VII.

19   In the time since these various motions for summary judgment were filed, Tony Twist
20 reached a settlement with Hanover, Citizens and General Star.  The question then arose whether
21 the indemnity issues presented here are moot.  The insurance companies argued that they are, but
22 the McFarlane Insureds disagreed, stating that the issue is moot only to the extent of a prospective
23 duty to indemnify, but that the breach of the duty to indemnify that allegedly occurred between the
24 time that the McFarlane Insureds became legally obligated to pay the judgment and the actual
25 payment of the judgment remains live.  This Court noted in its February 16, 2007, Order that this
26 precise issue  had not been briefed in these summary judgment motions.  Therefore, the Court
27 limited the hearing on these motions for summary judgment solely to the breach of the duty to
28 defend.  Based upon the Court's ruling in these motions, the Court concludes that no indemnity

- 3 -

Case 2:06-ap-00804-CGC    Doc 219    Filed 03/31/08    Entered 03/31/08 12:37:16    Desc
Main Document      Page 3 of 27

1  issues survive, but counsel for McFarlane Insureds may file a motion for reconsideration of this
2  decision within 15 days of the entry on the docket of this decision. If such a motion is filed, it will
3  be set for hearing in the ordinary course and counsel for Hanover, Citizens and General Star will
4  have adequate time to respond.

5  **II.    Background**

6      **A.  Procedural Status**

7      The dispute arises out of insurance issued to International by Citizens, Hanover and General
8  Star.  At the end of a long saga of litigation, judgment was entered in favor of Tony Twist, a
9  former hockey player in the National Hockey League, against Productions and McFarlane arising
10 out of claims of violation of Twist's right of publicity by certain McFarlane entities relating to the
11 use of  Twist's name in certain comic books, toys, action figures, movies and related items
12 produced, created and/or published by the Defendants.  Hanover, Citizens and General Star
13 arguably insured the loss.  Hanover and Citizens brought this declaratory judgment action against
14 the McFarlane Insureds on coverage in which General Star was joined. The matter is now ripe for
15 summary judgment.

16      **B.     The McFarlane Insureds**

17      The McFarlane Insureds contend that each McFarlane-related entity is responsible for
18 distinct duties with respect to the Spawn comic book related businesses.  For example, Productions
19 was in the business of creating comic book text and artwork for publication by others, of creating
20 other artwork, and of licensing the creation of derivative works based on these original materials.
21 Malibu Comics and Image Comics, Inc. were responsible for publishing the comic books
22 themselves. International was principally responsible for manufacturing and distributing toy action
23 figures, which included the Spawn characters.  It also distributed, or licensed for distribution,
24 apparel, trading cards, and other Spawn related products pursuant to a license from Productions.
25 McFarlane Entertainment created and licensed works for multimedia entertainment, particularly the
26 television, music and film industries.

27      At all relevant times, McFarlane was the executive officer and director of Productions,
28 International, and McFarlane Entertainment.  He was also the sole shareholder of Productions and

International and the majority shareholder of McFarlane Entertainment. In addition, he was a minority shareholder in Image Comics, a member of its board of directors, and its president, although the McFarlane Insureds deny McFarlane received any salary, had any employment duties with Image Comics, or even had an office at its California location. Malibu Comics no longer exists.

## C. The Insurance Policies

### 1. Hanover and Citizens

Hanover and Citizens each issued commercial general liability ("CGL") insurance policies naming International as its insured. Citizens issued a CGL policy to International effective May 1, 1994, through May 1, 1995. Coverage also extended under the Citizens policy to the named insured's executive officers with respect to acts taken in the scope of their duties as officers, directors, shareholders or employees of International. McFarlane, though not named, was covered to the extent of this provision. Productions was not originally nor was ever added as an additional or named insured under this Citizens policy.

On August 30, 1994, Hanover issued to International a CGL policy effective for the period June 1, 1994 to May 1, 1995.[1] Hanover thereafter issued a new CGL policy effective May 1, 1995 that was renewed twice through June 1, 1998. Productions was added as an additional insured on July 21, 1995, for the period through June 1, 1998, "with respect to liability arising out of [International's] operations or premises owned by or rented to [International]." Under each policy, McFarlane, though not named, was covered with respect to actions taken in his capacity as an officer, director, shareholder of International, as the named insured, and of Productions, to the extent previously noted. Neither Productions nor McFarlane was ever a "Named Insured" under any of the Citizens or Hanover policies.

Both the Citizens and Hanover CGL Policies covered damages resulting from personal injury caused by an offense arising out of the insureds' business and advertising injury caused by

---

[1]This policy was renewed in August 1994, with an effective date of May 1, 1994 and retained the same May 1, 1995, termination date. It was not renewed thereafter.

an offense committed in the course of advertising the insureds' goods, products or services. Personal and advertising injury was defined to include "[o]ral or written publication of material that slanders or libels a person [or] violates a person's right of privacy." The policies expressly excluded from coverage any injury that arose out of oral or written materials whose first publication occurred prior to the  beginning of the policy period and injury arising out of "[a]n offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting."

Both the Hanover and Citizens Policies provided that each insurance company would have the "right and duty to defend any 'suit' seeking" personal injury and advertising injury damages "to which this insurance applies."

### 2. General Star

General Star issued several policies to certain McFarlane entities.  The first, Umbrella Policy number IUG-322423, was issued to International on May 1, 1994, extended through May 1, 1995 and renewed, policy numbers IUG-322423A-G, through May 1, 2002, without any lapses in coverage.  International was the Named Insured under the policy from May 1, 1994, until May 1, 2002.  Though not originally named as an additional insured under the General Star policies, Productions was covered to the extent provided in the underlying Hanover policy.[2]  McFarlane was insured under the Umbrella Policy as an executive officer and director of International from May 1, 1994, and as an executive officer and director of Productions from and after 1995 with respect to his duties as an officer or director of that entity.

The Umbrella Policy covered "personal injury caused by an offense arising out of your business" and "advertising injury."  The Umbrella Policy defined "personal injury" and "advertising injury" to include injury arising from "oral or written publication of material that slanders or libels a person or organization" or "that violates a person's right of privacy."  Expressly excluded from coverage was any personal injury or advertising injury "[a]rising out of oral or written publication of material whose first publication took place before the beginning of

---

[2]General Star confirmed in 1997 to the McFarlane Insureds' broker that Productions was covered under the umbrella policies by virtue of the addition of Productions to the underlying Hanover policy in 1995. Ex. BB. Productions was added explicitly to the General Star policies in 1999.

1  the policy period."

2       Pursuant to the Umbrella Policy, General Star had a "duty to defend any claims or suits not
3  covered by any underlying insurance shown in the Schedule of Underlying Insurance" and a "duty
4  to defend any claims or suits if the applicable limit of underlying insurance is exhausted."
5  Otherwise, where other insurance exists, General Star had a right to associate in the defense, but
6  not an obligation.

7       Two years later, General Star issued an Excess Liability Policy numbered IXG-341678 to
8  International, effective from May 1, 1996, to May 1, 1997.  The Excess Policy incorporated by
9  reference the "terms, conditions, agreements, definitions, exclusions and limitations of the
10  controlling underlying insurance policy," meaning the Umbrella Policy.  The McFarlane Insureds
11  claim that Productions, McFarlane Entertainment and McFarlane were also insureds under the
12  Excess Policy because they were insureds under the Umbrella Policy.  They are not, however,
13  listed as the named insureds on the policy itself.

14       Under the Excess Liability Policy, General Star "shall not be obligated to investigate,
15  defend or settle any claim or suit against the Insured, but the Company shall have the right and shall
16  be given the opportunity to associate with the Insured or its underlying insurers, or both, in the
17  investigation, defense or settlement of any claim or suit which, in the opinion of the company,
18  involves or appears to involve the Company."

19       Approximately four years after the first issuance of the Umbrella Policy and two years after
20  the first issuance of the Excess Policy, General Star issued to International a Multimedia Policy
21  numbered IYG-358511 ("Multimedia Policy) with an effective date of June 1, 1998 - May 1, 1999.
22  This Multimedia Policy was renewed and extended on several occasions, and without interruption,
23  through May 1, 2001.  Productions and McFarlane Entertainment were Named Insureds under the
24  Multimedia Policy effective May 1, 1998.  McFarlane was insured under the Multimedia Policy
25  in his capacity as a "director, officer, shareholder, partner trustee, or employee" of International
26  and Productions, but only while acting within the scope of such duties."  Under the Multimedia
27  Policy, General Star agreed to pay all losses arising out of:

28       A.  any form of defamation or other tort related to disparagement or harm to the

character reputation or feelings of any natural person or organization, including, but not limited to, libel, slander product disparagement, trade libel, infliction of emotional distress, outrage, or outrageous conduct.

B.  any form of invasion, infringement or interference with rights of privacy or publicity, including, but not limited to, false light, public disclosure of private facts, intrusion and commercial appropriation of name or likeness;

\*                                    \*                                    \*

committed in the utterance or dissemination of "matter" arising out of an "occurrence" during the policy term regardless of when "claim" is made or "suit" is brought.

The Multimedia Policy did exclude coverage for claims "arising out of 'occurrences' prior to the effective date of the first policy issued by" General Star.

Under the Multimedia Policy, General Star had a right and duty to defend the insured against any claim or suit seeking damages to which the Policy applied.  It further agreed to pay on behalf the insured the "ultimate net loss in excess of the retained limit because of personal injury or advertising injury to which this insurance applies."

**D.     The Tony Twist Character**

There are many appearances and references to the character Tony Twist in a variety of mediums (comic books, toys, movies, etc.) that were released, published or broadcast over the course of a number of years.  For purposes of this decision, the Court will not recap the entire history.  The following highlights a few of the more important releases.

The first Spawn comic book came out in May or June, 1992.  There was no reference to the Tony Twist character at that time, whether by that name or by any other alias.  In November, 1992, an unnamed fictional mob boss appeared in Issue No. 6 of Spawn, who later was identified as Tony Twist.  In Issue No. 7, issued in January, 1993, the mob boss is referred for the first time by the name Antonio Twistelli.  This name was subsequently shortened to Tony Twist and appeared for the first time in Issue No. 15 in November, 1993.  The Tony Twist character is referred to in that Issue as a "criminal kingpin" trying to get credit for The Violator's kills.  In May, 1994, the character Tony Twist appears in Spawn 21 identified as "Antonio Twistelli aka Tony Twist aka Dracula."  In Issue No. 24, printed in September, 1994, McFarlane responds to a fan letter in the

editorial section of the comic book and admits naming a lot of his characters after current NHL players

> I am a big hockey fan, and a lot of my characters have been named after current NHL hockey players. For example, Antonio Twistelli a.k.a. Tony Twist is actually the name of a hockey player for the Quebec Nordiques.

Several other issues were released in 1994 that referred to Tony Twist or Antonio Twistelli either in the story itself or in the editorial sections.

Tony Twist appeared in a three issue comic book mini-series entitled "Violator" starting in May, 1994. The Tony Twist character appeared in several comic books that were packaged for sale with unrelated action figures in late 1994 through 1997. The Twist character was referred to in a comic-book-format promotional magazine, Inside Image, which was first released in May, 1994. Issues of Spawn were released in 1995 that referred to the character Tony Twist and his alias Antonio Twistelli. Trading cards were issued in 1995 including depictions of the Tony Twist character. In 1996, Productions produced and issued the Spawn Bible Comic Book that included a one page illustration and biography of the Tony Twist character. Tony Twist was included in various issues of Spawn in 1996. The Twist character was referred to in the copy text of advertisements for Spawn Issues Nos. 46 and 47 in a industry sales catalog called Previews in early 1996. In 1996 through 1998, prior Spawn comic books that included the Tony Twist character were compiled and published in a single trade paperback.

The Tony Twist character appeared in numerous Spawn Issues released in 1997. HBO released an animated Spawn series in 1997 that included Tony Twist in all six episodes of the first season. These episodes were later released on home video.

The Tony Twist character is referenced and appears in 1998 in another comic book series called Curse of the Spawn. The Tony Twist character appeared in copy text for advertisements in Previews for Curse of the Spawn. Another bible of the Spawn characters was released in early 1998 and included Tony Twist. Additional Spawn comic books were released in 1999 through 2003 in which Tony Twist appeared at different times.

### E. The Twist Litigation

The original Twist complaint alleged claims for appropriation of name and likeness,

defamation, unjust enrichment, misappropriation and civil conspiracy against a number of defendants. The original complaint, and the two amendments to it, referred specifically to Spawn 6, 7 and 21 and Violator Issues 1 and 3 as part of the overall "commercial enterprise" by the various McFarlane entities to take commercial advantage of the identity and name of Tony Twist. Spawn 6, 7 and 15 (referenced in the amended complaints) were all published before the initial date of any insurance coverage. The Violator Issues and Spawn 21 were published in May, 1994, immediately after the inception of the first policies issued by Citizens, Hanover and General Star.

Twist attached to the complaint a copy of the "Spawn Compendium", a republication in 1997 of the first 25 issues of Spawn, including 6, 7 , 15 and 21. Although it is difficult to tell from the copies in the record, the Court concludes that the original publication dates of these issues do not appear in the Compendium and no specific dates for these initial publications are specified in the complaints.

Before the first trial, all defendants except McFarlane, Productions, International, McFarlane Entertainment, and Image Comics had been dismissed by way of settlement. The first trial in the Twist Litigation occurred in 2000 and ended in a $24.5 million jury verdict against the five remaining defendants. This jury verdict was subsequently reversed by the trial court's judgment notwithstanding the verdict ("JNOV") and the trial court issued an alternative new trial ruling. The JNOV was appealed and, ultimately, the Missouri Supreme Court reversed, announcing the elements of a right of publicity claim in Missouri and remanding the case for a new trial.

A second trial was held, the primary focus of which was on the uses of Twist's name by the McFarlane Insureds as a symbol of his identity with the intent to obtain a commercial advantage. The trial resulted in a $15 million jury verdict against McFarlane and Productions. The jury returned a defense verdict in favor of International, McFarlane Entertainment, and Image Comics. McFarlane and Productions appealed the verdict to the Missouri Court of Appeals, where the judgment was affirmed in June, 2006. McFarlane and Productions then sought review by the Missouri Supreme Court, which affirmed. Twist's appeal of the defense verdict in favor of the remaining defendants was dismissed on September 21, 2005.

# III.    Standard for Motion for Summary Judgment

A motion for summary judgment should be granted if movant has shown that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FRCP 56(c), BR 7056. Ruling on a motion for summary judgment necessarily implicates that substantive evidentiary standard of proof which would apply at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 at 2512, 91 L.Ed.2d 202 (1986). A material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Id.* Procedurally, "the proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *In re Aquaslide 'N' Dive Corp.*, 85 Bankr. 545, 547 (Bankr. 9th Cir. 1987). Once that burden has been met, "the opponent must affirmatively show that a material issue of fact remains in dispute." *Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985). That is, the opponent cannot assert the existence "of some alleged factual dispute between the parties." *Liberty Lobby*, *supra*. In this case, all parties suggest that summary judgment is appropriate.

# IV.    Duty to Defend Analysis

## A. Tender of Defense

Before the duty to defend can be breached, the insured must tender the defense to the insurance carrier. It appears that all the policies involved require that the insured provide notice of any claim or suit as soon as practicable to the insurer and immediately provide copies of any demands, notices, summonses or legal papers received in connection with any claim or suit. In this way, the insurance carrier is put on notice of the claims against its insured that may fall within its insurance coverage, and it creates a temporal universe of facts against which the insurance company must analyze whether it has a duty to defend.

Generally, a duty to defend is determined by comparing the coverage language in the applicable insurance policy with the allegations set forth in the underlying complaint. *See McCormack Baron Mgmt. Serv. v. Am. Guarantee & Liab. Ins. Co.,* 989 S.W.2d 168, 170 (Mo. 1999). The parties all acknowledge, however, that if the defense was not tendered until after the trial, the duty to defend would be determined by comparing the facts as established at trial to the

coverage language, which could be significantly different than what was simply alleged in the original complaint. *See Hawkey-Security Ins. Co. v. Iowa Nat. Mut. Ins.*, 567 S.W.2d 719 (Mo.App. 1978). The insured "has the burden of showing that the loss and damages are covered by the policy" and the insurer "has the burden of demonstrating the applicability of any exclusions on which it relies." *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo.App.E.D. 1998); *See also Truck Ins. Exchange v. Prairie Framing, LLC*, 162 S.W.3d 64, 80 (Mo.App.W.D. 2005). To bring itself within the terms of the policy, the insured, "must carry the burden of offering substantial evidence that the underlying claim is covered by the policy." *Am. States Ins. Co. v. Votherms*, 5 S.W.3d 538, 543 (Mo.App.E.D. 1999); *Trans World Airlines, Inc. v. Assoc. Aviation Underwriters*, 58 S.W.3d 609, 618-619 (Mo.App.E.D. 2001). Likewise, it is the insured's burden to show that it has complied with the notice obligations under the insurance contract. *See Valentine-Radford, Inc. v. Am. Motorists Ins. Co.*, 990 S.W.2d 47, 51 (Mo.App. W.D. 1999).

In this matter, meeting the burden of proof is pivotal in the Court's analysis. "Where the underlying facts are not in question, disputes arising from the interpretation and application of an insurance policy are matters of law." *Trainwreck West Inc. V. Burlington Ins. Co.*, 235 S.W.3d 33, 38-39 (Mo.App.E.D. 2007) (citing *Keisker v. Farmer*, 90 S.W.3d 71, 74 (Mo. banc 2002)). The facts here are not in dispute but the interpretation of those facts is. What constitutes a valid tender is the subject of debate among the parties here. When, if ever, the defense was tendered in this case is disputed by all the insurance companies.

1. Hanover and Citizens

The McFarlane Insureds contend they tendered the defense to Hanover and Citizens on or about February 23, 1998. In support of this position, the McFarlane Insureds cite to a February 23, 1998, letter from Jon Chick at International to Kevin Sweet at Sweet & Associates, Ltd. (Sweet & Associates") (Exhibit DD) and a February 27, 1998, letter from Christine Crownover at Sweet & Associates to Carole Cothran at McAlear Associates, Inc. (Exhibit EE). Additionally, Sweet &

Associates gave notice of the lawsuit to Hanover.[3] Thus, while there is no serious issue that notice of the lawsuit against International was given to Hanover, and that Hanover thereafter provided a defense to International with a reservation of rights, Citizens and Hanover do not agree that the defense was tendered on behalf of Productions and McFarlane.

Exhibit DD is a letter from International to Hanover and Citizens' agent.[4] Therefore, because the acts of an insurer's agent are imputable to the insurer, Exhibit DD establishes that International provided notice of the Twist Litigation to Sweet & Associates on February 23, 1998. Leo R. Russ & Thomas F. Segalla *Couch on Insurance 2d* § 45:1 (3d ed. 2007). Once notice of the lawsuit was given to Sweet and Associates, notice of the lawsuit was imputed to Citizens and Hanover for all the insureds. *Couch on Insurance* § 200:30.

However, Exhibits DD, EE and 10 do not establish that the defense of Productions and McFarlane was properly tendered to either Citizens or Hanover. Depending on the facts, there may be a difference between putting an insurance carrier on notice and tendering a defense. *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 790 F.Supp. 1318 (E.D. Mich 1992). International's letter does not state that it intended to tender its defense to either Citizens or Hanover and no mention at all is made of the other two potential additional insureds, Productions or McFarlane.

Though the duty to defend technically arises when the insurer is notified of the dispute, the liability for reimbursement, among sophisticated parties, does not arise until a defense is requested. *Century Indem. Co. v. Aero-Motive Co.*, 318 F.Supp.2d 530, 544 (W.D.Mich 2003); *Ex-Cell-O* at 1329. A key to the finding in *Ex-Cell-O* was that the policyholder "had available both in-house and outside legal advice." *Id.* at 1330. In this case, there is no dispute that International was a sophisticated policy holder. Jon Chick, in-house counsel for International, sent the February 1998 letter to Sweet & Associates. The April 6, 1998 Letter (Ex. HH) from Hanover to International

---

[3]Exhibit 10 is a February 28, 1988 letter from Sweet & Associates to Citizens referencing Hanover Policy #ZHH 4312739 and containing enclosed court documents. Though sent to its affiliate Citizens, Hanover does not contend that this misdirection affected the notice given to it.

[4]A review of the Citizens Policies (Ex. D and Ex. E) and the Hanover Policies (Ex. G, Ex. H, Ex. I and Ex. J.) all reference Sweet and Associates as the agent that issued the policies.

outlining Hanover's proposed coverage is addressed to Mr. Chick and begins with "I am writing as a follow-up to our recent telephone conversation . . ." Clearly, Mr. Chick was the point person at International regarding obtaining defense coverage from Hanover.

The McFarlane Insureds also had access to outside legal counsel. Ex. II is a letter in April 1999 from Edwin d. Akers, Jr., outside counsel to Productions, formally tendering defense of the lawsuit to Travelers Insurance.[5] Thus, although the McFarlane Insureds were sophisticated policyholders, the record is devoid of any evidence that defense of the lawsuit was actually tendered to Citizens or Hanover.

Nevertheless, as noted previously, Hanover did in fact agree to defend International, under a reservation of rights, under policy ZHH4312739 by letter dated April 6, 1998 (Exhibit HH), stating:

> Hanover recognizes that if the claim is found to be valid and falls within the provisions of the policy, we may become obligated to indemnify TMP International, Inc. for all or part of the claim made, subject to the conditions, limitations, exclusions and agreements set forth in the policy. Hanover agrees to provide a full defense for the TMP International, Inc., but we reserve our rights for the reasons set forth below.

From this point in time through the great bulk of the litigation, the record reflects no further discussion of or communication relating to Citizens or Hanover's duty to defend, or any purported breach of that duty, until May 24, 2004. On that date, Hanover sent International its so-called "Repudiation Letter", Exhibit LL. While this letter will be discussed in other contexts later, for present purposes it is important because it sets for the terms of a purported agreement under which Hanover had been defending the lawsuit from inception to that point. The letter states:

> [P]ursuant to our previous reservation of rights letter and an agreement with TMP International, Inc. ("TMP International"), Hanover agreed to reimburse the legal fees incurred by TMP International, Inc. [sic] which amounted to 33.3 percent of

---

[5] These various exhibits highlight the difference between giving notice and tendering defense. Compare the letters which gave notice to Hanover (Ex. DD and Ex. 10) to the letter to Travelers (Ex. II). The letters to Sweet & Associates and Hanover simply state that copies of the lawsuit are enclosed. The letter to Drachman-Leed Insurance, Inc. states, "[o]n behalf of Todd McFarlane Productions, Inc. I am hereby tendering defense of the action to The Travelers, although I understand from our telephone conversation yesterday that you believe there is no coverage under the policy..."

Case 2:06-ap-00804-CGC    Doc 219    Filed 03/31/08    Entered 03/31/08 12:37:16    Desc
Main Document    Page 14 of 27

the legal fees and expenses incurred jointly by Mr. McFarlane, TMP International and TMP Productions, Inc. ("TMP Productions") at the rate of $140 per hour for lawyer time during the time that these entities were defended by Mr. Ed. Akers, Esq.. We understand that while Mr. Kahn was representing all the defendants, Mr. McFarlane, TMP Productions and TMP International were jointly responsible for 50 percent of the total fees and expenses charged by Mr. Kahn. Hanover had previously agreed to pay 33.3 percent of that 50 percent.

Nowhere in the record is there any evidence that the McFarlane Insureds either 1) did not make the fee sharing agreement, or 2) protested or complained in any way about its terms from the original undertaking of the defense by Hanover until after the Repudiation Letter. Given the voluminousness of the record, and the parties' general agreement that the matter is ripe for summary judgment and without genuine issues of material fact, the Court concludes that, after tender and acceptance of defense by Hanover, a defense was provided for International but, by agreement, not for Productions or McFarlane individually, and that the reimbursement obligation for Hanover was fixed by that agreement.

The McFarlane Insureds contend that it is at best disingenuous to argue that Hanover did not have a duty to defend Productions or McFarlane because of the lack of an effective tender of defense, given that both Productions and McFarlane, as an officer of both International and Productions, were insured under policy ZHH4312739. However, as noted, the record belies this position, containing, as it does, no indication that Productions or McFarlane ever tendered a claim. As noted in *Ex-Cell-O*:

> there are several strategic reasons why an insured party may wish to give notice of a claim but delay a tender of defense. The insured could then maintain control over the selection of counsel, the strategic course of events, and have greater control over the ultimate settlement by having its own counsel defend.

*Id.* at 1331. This is what apparently transpired. McFarlane admitted that the "McFarlane entities' lawyers were involved in deciding" who was going to fund what part of the defense of the Twist litigation.[6] This is consistent with the agreement outlined in the Repudiation Letter.

The McFarlane Insureds wanted to control the funding of the defense of the litigation. In order to control its defense, the McFarlane Insureds chose when to tender a defense to their various

---

[6] Statement of Facts 107 to General Star's Omnibus Statement of Undisputed Material Facts. Admitted in McFarlane Insureds' Response.

insurance companies. Until a defense is tendered, an insurance company has no obligation to defend.[7]

At its core, this is a contract dispute. Based on the insurance contract, the McFarlane insureds were on notice that any unapproved defense payments would run the risk of not being reimbursed. According to the Section IV(2)(d) or the insurance contract with Hanover, International agreed that, "[n]o insured will, except at their own cost, voluntarily make payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Here, there is no evidence that the McFarlane Insureds ever requested payment from Hanover for the remaining two-thirds of its defense from 1998 to 2004. If the McFarlane Insureds had requested a defense and it was denied, the payments would have been involuntary. Here, they made no such request. According to the contract, they made payments at their own risk. Not surprisingly, the insurance contract in *Ex-Cell-O* contained virtually identical language, "(c) . . . The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident." *Id.* at 1325. Much like the court in *Ex-Cell-O*, this Court will not excuse the McFarlane Insureds lack of demand.

The McFarlane Insureds argue that Michigan law and Missouri law are inconsistent on whether formal tender is required before an insurer is obligated to pay for the defense. The Court

---

[7] Footnote 7 in *Ex-Cell-O* at 1330-31 provides the following analogy:
This logic is clearer if one considers, by analogy, the right to automobile use and services instead of the right to legal defense .... Many automobile dealers offer extended care automobile warranties that entitle the car owners to both (i) warranty repair services and (ii) the use of a substitute car while his car is repaired. If a car owner brings in a car for warranty service and does not immediately request a free substitute car, but chooses instead to rent one, that car owner could not thereafter demand to be reimbursed for the "voluntary" car rental. The car owner may have wanted more control over the choice and quality of the substitute car than taking the dealer-provided car. Absent perchance some prejudice to the dealer, private rental of a substitute car for a few days would not waive the car owner's right later to demand a substitute car from the dealership issuing the extended warranty. Yet, a car owner who made a tardy demand for a dealer-provided substitute car would have waived the right to such a car prior to making the demand. If the car owner's tardy demand for a substitute car were wrongfully denied, the damages would only cover post-demand car rental costs, not those voluntarily incurred before the demand was made.

1  disagrees. In Missouri an "insurer must be given notice of the complaint or pleading, which would

2  invoke the duty to defend." *Trans World Airlines* at 620. However, in *Trans World* the trial court

3  found that the insured "never filed anything resembling a formal claim to the [insurer]" and that

4  once a claim was filed the insurer then responded with a reservation of rights letter. *Id*. Thus, the

5  court determined that the insured "never made a clam against its insurers for either defense or

6  indemnity." *Id*. The appellate court upheld the trial court's findings. This reasoning is compatible

7  with Michigan decisions of *Ex-Cell-O* and *Aero-Motive*.

8      In sum, International gave notice of the claim and Hanover agreed to defend, with a

9  reservation of rights. Because no demand to defend was ever made on behalf of Productions or

10 McFarlane (in his individual capacity or as an executive officer of Productions) and because the

11 parties agreed that Hanover's reimbursement liability would be limited pursuant to a formula to fees

12 incurred on behalf of International, there is no breach by Citizens and Hanover of a duty to defend

13 Productions or McFarlane.

14 2. General Star

15     The facts are largely, though not entirely, similar with respect to General Star. The

16 McFarlane Insureds argue they tendered the defense to General Star in February, 1998 though

17 Exhibit FF, which contains two form letters dated March 2, 1998, from McAlear Associates to

18 General Star on behalf of insured "TMP International, Inc. Etal" providing a "first notice of loss"

19 under Products Liability policy  IYG322225C, policy period 05/01/97-05/01/98  and Primary

20 Umbrella policy IUG322423C, for policy period 05/01/97-05/01/98.  The letter did not expressly

21 state that International  was tendering the defense to General Star, but it did notify General Star of

22 the Twist Litigation and enclose a copy of the lawsuit.  In addition, in the comment section of the

23 notice under the Products Liability policy, it said "[t]his claim could span several policy years.  No

24 clear dates of occurrence were stated in the suit papers.  We are just referring the claim under the

25 current policy year."

26     General Star responded by letter, denying coverage under the Products Liability policy (a

27 decision no one disputes) and suggesting referral of the lawsuit to International's primary liability

28 carrier.  The record reflects no further correspondence from the McFarlane Insureds concerning

the Umbrella policy or defense of the lawsuit by General Star for seven years.  In April, 2005, a tender of defense was made to General Star, after completion of both trials and the filing of an appeal from the second judgment. According to the McFarlane Insureds, this request to defend in 2005 was tendered in order to properly incorporate claims not originally pled in Twist's complaints, but that were allowed in during the trial and that were the subject of Twist's subsequent motion for the pleadings to conform to the evidence.

General Star argues that the initial notice in 1998 was informational only because 1) it referenced the Products Liability policy that was clearly not applicable, 2) no specific request to defend was made, and 3) it had no obligation to defend if defense was provided by the underlying carrier, which, in this case, it was. In any event, as with Hanover and Citizens, the notice correspondence reflects no mention of Productions or McFarlane, let alone a specific tender of defense, until April, 2005.

As the Court held with respect to Hanover and Citizens, a formal tender of defense was necessary before a duty to reimburse defense expenses exists, even if technically the duty to defend arises.  Accordingly, no potential obligation to reimburse existed until April 2005.

**B.  Duty to Defend Standard**

1.    Hanover[8]

Hanover did in fact provide a defense to International pursuant to an agreement on the sharing of fees described above. For purposes of these motions, the question is whether that duty in effect  did not exist notwithstanding Hanover's undertaking of it; in short, the issue is whether by reserving its rights, Hanover can now argue that it had no duty to defend.  The answer is yes.

---

[8]Citizens is barely discussed in the pending motions.  It issued the initial CGL policy in 1994 which was subsequently superceded by a policy written by its affiliate Hanover for the same policy year. Thereafter, only Hanover provided primary liability coverage. The Citizens' policy covered only International and was not subject to the later endorsement adding Productions as an initial insured. Therefore, summary judgment is appropriate in favor of Citizens on all of Productions' claims. The same is true for the first Hanover policy effective during the same time.  The Productions' endorsement applied only to the later issued Hanover policies.

Although Hanover raises several substantive bases on which the Twist claim was excluded from the scope of its policy, three are worthy of discussion for purposes of disposition of the pending motions: 1) prior publication; 2) the limitation on Productions' coverage as an additional insured; and 3) McFarlane's personal liability.[9]

The duty to defend is broader than the duty to indemnify. The concept is that insureds should be entitled to a defense if the claim could arguably come within the terms of the policy even where an insurer may later refuse to indemnify. Thus, the duty to defend exists where an insured is exposed to potential liability, "no matter how unlikely it is that the insured will be found liable and whether or not the insured is ultimately found liable." *Truck Ins. Exchange v. Prairie Framing, LLC,* 162 S.W.3d 64, 79 (Mo. App.W.D. 2005) (citing John C. Appleman, 7C Insurance Law and Practice § 4684.01 (1979)). The duty is not limited to meritorious suits, but may extend to lawsuits that ultimately prove groundless, false, or fraudulent, as long as the allegations against the insured "even arguably come within the policy coverage." *Detroit Edison Co. v. Michigan Mutual Ins. Co.,* 301 N.W.2d 832, 835 (Mich. App. 1980); *U.S. Conservation Chemical Co.,* 653 F. Supp. 152 (W.D. Mo. 1986). The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. *Shepard Marine Construction Co. v. Maryland Casualty Co.*, 250 N.W.2d 541 (Mich. App. 1976). "If the allegations in the [underlying complaint] and the facts [the insurance company] knew or could have ascertained from a reasonable investigation, are potentially within the scope of the policy's coverage," then the insurer had a duty to defend. *Truck Ins. Exchange* at 79. Where there is doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor. *Couch on Insurance* § 200:12. However, a duty to defend ends when, "it can be established that the claims asserted are outside the scope of coverage under the policy." *Aero-Motive Co.* at 541.

---

[9]The two other primary substantive arguments, whether the claim asserted advertising injury and whether the insured was in the business of publishing, are serious issues but need not be determined given the disposition of these motions on other grounds. The court further notes, that despite the parties' contentions to the contrary, those issues may be susceptible of genuine issues of fact precluding decision on summary judgment.

1    The starting point for analyzing whether a duty to defend exists is the complaint. Hanover

2    argues that the Complaint itself made clear that the McFarlane Insureds had used material published

3    prior to the policy's effective date, thereby triggering the prior publication exclusion. That

4    exclusion states:

5        This insurance does not apply to: . . . 'Personal injury' or 'advertising injury:' . . .
         arising out of an oral or written publication of material whose first publication took place
6        before the beginning of the policy period.

7    Hanover asserts that the complaint specifically referenced Spawn 6, 7 and 15, all of which were

8    published prior to May 1, 1994, the inception date of the first policy, and all of which, to a greater

9    or lesser extent, referenced Tony Twist, the criminal mob boss. Further, copies of these issues of

10   Spawn were attached to the complaint as part of the Spawn Compendium.

11       This argument has surface appeal but cannot pass the broadly worded test for initially

12   assessing whether a duty to defend exists. This is true because the complaint does not state when

13   Spawn 6, 7 and 15 were published and the Compendium was published in 1997, after the inception

14   date of the first policy. Further, the exclusion requires that the same "material" be published prior

15   to the inception date and, in the context of Twist's multitude of claims, the scope of this undefined

16   term is unclear. Apparently sensing at least some of the same difficulties, Hanover did in fact

17   defend under a reservation of rights.

18       However, as the lawsuit went through its tortuous path of two full jury trials and two full

19   appeals, everything became much clearer. First, the publication dates of Spawn 6, 7 and 15 were

20   established. Second, and more importantly, the Missouri Supreme Court defined the contours of

21   the tort that underlay Twist's claim–misappropriation of a person's name as a symbol of his identity

22   for commercial exploitation. This definition of the tort is critical because it gives meaning to the

23   term "material." Unlike the facts of cases relied upon by the McFarlane Insureds where each new

24   "use" could be viewed as new "material",[10] the "material" in this case was the name "Tony Twist"

25   _____

26       [10] The McFarlane Insureds ask the Court to adopt *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d
         1069 (7th Cir. 2004). In *Taco Bell*, the insurers invoked the prior publication defense to a claim by
27       the insureds of advertising injury. Taco Bell misappropriated the idea for their advertising campaign
         involving a "Psycho Chihuahua." This misappropriation occurred both pre and post coverage by
28       the insurer. The court refused to allow the prior publication defense. Key to its conclusion was that

used as symbol of his identity. Viewed in this way, the use of the name is not the important factor; rather, it is the name itself. Therefore, whether the name is used in comic books, trading cards, toys, action figures or an HBO special is not determinative or even relevant; the key point is that Twist's name *was* exploited for commercial advantage, not *how* it was exploited.

The McFarlane Insureds argue that the point at which the connection became clear was McFarlane's admission of the hockey player connection in September, 1994 and that date is after the inception of the policies, thereby precluding the application of the prior publication exclusion. This analysis is incorrect because the critical point is not when McFarlane admits the connection but when the use of the name begins. It is important to note that McFarlane's "admission" was in response to a fan's letter, not a sudden revelation. Clearly, at least one person in the Spawn reading public had made the connection sufficiently to send the query to McFarlane. It is impossible to know when that connection was made and whether others made it earlier.

But it is possible to see an unbroken development and evolution of the use of Twist's name from the first introduction of the unnamed mob boss in 1993 (Spawn 6) through the use of the name Antonio Twistelli (Spawn 7) and then use of the name Tony Twist itself (Spawn 15 and Inside Image 15), all of which occurred prior to the inception date of the first Hanover policy, and on through the extensive development of the character thereafter. There is nothing in the record to support the contrary conclusion that the pre-policy use of the name was coincidental with the later identification of the character to the hockey player. Indeed, the opposite is true; there is no genuine issue of material fact that there was any difference in the use of the name pre- and post-policy inception.

---

the charges of misappropriation were pled as separate torts, "and those torts occurred during the period covered by [insurer's] policy." *Id.* at 1074. This matter does not involve separate torts. Instead it involves a single, continued tort. As such, *Taco Bell*, is inapplicable.

Moreover, a prior publication exclusion exists when the offense is substantially similar. *See Ringler Assoc. Inc. v. Maryland Cas. Co.*, 80 Cal.App.4th 1165, 1183 (Cal.App.1.Dist 2000) Here, the offense was substantially similar (and arguably the same) - the continued use of the name Tony Twist as a symbol of his identity. *See also John Deere Ins. Co. v. Shamrock Indus., Inc.*, 696 F.Supp. 434, 441 (D.Minn. 1988) (finding that even though the dates of the advertising injury were unclear in the complaint, prior publication exclusion applies because, "those dates were discernable well before the commencement of the policy period.")

1      Thus, no later than 2003 when the Missouri Supreme Court issued its TCI decision

2 following the first trial, the smoke had cleared sufficiently to determine that in a right of publicity

3 case, the use of the name as a symbol of a person's identity was the essence of the claim and that

4 the term "material" in the prior publication exclusion had to be defined against that background.

5      Throughout this time, and until the Repudiation Letter in May 2004, Hanover continued

6 to provide a defense to International, consistent with its letter of April 1998 wherein it stated "[d]ue

7 to the potential coverage and since Hanover's duty to defend is broader then its duty to indemnify,

8 we will provide a defense for the entire lawsuit." Contrary to assertions of the McFarlane Insureds

9 that the Repudiation Letter left them high and dry two weeks before trial, the fact is that Hanover

10 continued to defend through trial, reserving its right to refuse to defend thereafter.

11      The heart of this lawsuit (in addition to the McFarlane Insureds' stated belief that they are

12 owed additional reimbursement for the pre-repudiation period) is that they were left with no choice

13 but to file this bankruptcy case following the second adverse verdict and without the ability to bond

14 the judgment in the absence of an insurance company's willingness to do so. But by the point of

15 the second verdict, the facts were clear that there was neither a duty to defend or to indemnify

16 because of the applicability of the prior publication exclusion. Therefore, whether or not the

17 underlying policy required the posting of an appeal bond (and the parties dispute this point),

18 Hanover was under no obligation to do so following its May 2004 letter which appropriately

19 determined that it had no obligation to indemnify but it nonetheless continued to provide a defense.

20      "A duty to defend continues until final resolution of the covered claims." *Couch on*

21 *Insurance* § 200:49. At the end of the second trial, International was exonerated through a defense

22 verdict and Twist's appeal was dismissed on September 21, 2005. At that point, whatever

23 continuing duty Hanover had to defend International was extinguished.

24      The Court has already determined that even if there was a technical duty to defend

25 Productions arising out of the notice given, there was no duty to reimburse without a formal

26 demand. No such demand was made prior to the Repudiation letter. Accordingly, the prior

27 publication discussion above equally applies to Productions and McFarlane. Indeed, it is even more

28 true for Productions and McFarlane, the parties held liable at the end of the day, that the use of the

name Tony Twist began prior to inception of any coverage. By the time of the Productions endorsement, several more uses of the Twist character had been published (including at least three uses in Spawn and two in Violator, among others) and McFarlane had twice linked the mob boss to the hockey player in the letters portion of Spawn. In short, had a formal tender of defense been made by Productions and McFarlane at the beginning of the lawsuit (which it was not) and had Hanover refused to defend Productions and McFarlane (a decision it was not called upon to make), any duty to defend would have evaporated no later than the Missouri Supreme Court decision providing scope to the term "material."

The second issue deserving of brief discussion is the limitation contained in the Productions endorsement. As noted, Productions was never a named insured on any Citizens or Hanover policy. During the term of the second Hanover policy, it was added as an additional insured for liability arising out the operations of International. For purposes of determining if there was a duty to defend Productions in post-trial and appellate matters following the second adverse jury verdict (and assuming for this purpose that tender had been adequate), the question arises whether any such duty would have ceased upon the finality of the defense verdict in favor of International. The answer is yes.

It follows logically that where an entity is insured derivatively for liability arising out of activities of a primary insured which is exonerated, there is no remaining basis for coverage for the additional insured. In this case, this impact would extend both to Productions and McFarlane in his executive capacity with that entity.

The McFarlane Insureds' answer is that the complaint alleged and the proof at trial addressed that the misappropriation of Twist's name was an integrated enterprise involving all of the various McFarlane Insureds, thereby making such a delineation both impractical and inappropriate. The proof here is in the pudding. The jury apparently had no difficulty in differentiating which entities were liable to Twist and did so in stark terms. Had Productions been an insured on its own, its arguments would make sense. But, here, its coverage was purely derivative and the exoneration of the principal likewise proved that its liability was not related to the risks covered by the policies. The same is true, of course, with McFarlane in connection with

1  his executive position at Productions.  Thus, had a duty to defend existed (which it did not), it
2  would have disappeared no later than September 21, 2005.

3  The third issue is McFarlane's personal liability.  There is no dispute that he was not
4  individually insured under any of the policies.  The complaint simply names McFarlane, without
5  denominating the capacity in which he was sued.  Therefore, any duty to defend McFarlane must
6  have, as a matter of contract, related to his position with International arising from the operations
7  of International or, after July 1995, his position with Productions insofar as liability arose from
8  operations of International.  First, as previously stated, the record reflects an agreement among the
9  parties that Hanover agreed to defend the entire lawsuit reimbursing only a stated percentage of the
10  fees.  There is nothing in the record to suggest that McFarlane was undefended.  Second, the prior
11  publication exclusion applies equally to McFarlane on the same terms as stated above.  Indeed, the
12  evidence in the Twist litigation suggests that McFarlane was acting individually, at least during the
13  time prior to the incorporation of Productions.  He drew the Spawn characters and copyrighted
14  them individually.  In the final analysis, the fact that neither International nor Productions was
15  entitled to a defense on these claims, notwithstanding Hanover's agreement to provide one to
16  International, leads to the conclusion that McFarlane was likewise not so entitled.  As a result, there
17  can be no breach of the duty to defend.

18  2. General Star

19  Virtually all of what has been said regarding Hanover applies equally to General Star.  The
20  four separate issues that need to be addressed are 1) whether tender was different to General Star,
21  2) whether General Star failed to reserve its rights, 3) whether there was primary liability on claims
22  from foreign sales, and 4) whether the initial verdict in potential excess of underlying insurance
23  triggered General Star's duty to defend.

24  There are no substantive differences in tender to General Star than to Hanover.  As a result,
25  the same conclusions apply.  The difference is that Hanover, as the primary insurer, agreed to
26  defend (thereby deferring any obligation of General Star to defend).  However, in addition, there
27  was no independent obligation to defend Productions and McFarlane for the same reasons as stated
28  above.

The McFarlane Insureds argue that General Star reserved no rights when it declined coverage at the beginning of the case. This is not correct. General Star's umbrella policy was excess both to its own products liability policy and to the Hanover policy. General Star declined coverage on the products liability policy in explicit terms and referred the insured to the primary carrier (Hanover) with regard to the primary defense of the lawsuit. At this point in time, as an excess carrier, General Star had no duty to defend until the primary insurance had been exhausted or the primary insurer has tendered its policy limits. *Frankenmuth Mut. Ins. Co., Inc. v. Cont'l Ins. Co.*, 537 N.W.2d 879, 881 (Mich. 1995); *Couch on Insurance* § 200:38. Its rights were reserved pending a determination of whether the primary insurance would be exhausted.

The McFarlane Insureds argue that General Star was the primary insurer on claims arising from foreign sales of Spawn containing offending Twist references because its excess coverage "dropped down" where Hanover had no such coverage. This argument is not persuasive. The exclusion is for products not "made" in the United States. Although both parties argue vociferously about the meaning of "made," it is clear on the record that all of the Spawn publications and other uses were "made" in the United States, thereby making them subject to Hanover's primary coverage and not "made" in various other countries, thereby triggering General Star's primary coverage. The changes made overseas were ministerial–language, local format and so on–but the primary artistic content remained the same. In this case, the content was modified to adapt to each additional country, but it was not "made" there. Therefore, the Court rejects this argument by the McFarlane Insureds.

Finally, the McFarlane Insureds' argue that General Star's obligation to defend was triggered by the first verdict in excess of the underlying coverage. While this may be true if the primary carriers paid in their policy limits, thereby exiting the scene, it is not true where the issue remains live and no payments have been made, as was the case here after the first verdict. Hanover continued to defend; therefore, General Star had no additional duty to defend. In short, the Court concludes that this excess policy provides under Section II (3), "[w]hen an occurrence or offense is covered by this policy and is also covered by underlying insurance or by any other applicable insurance, we have no duty to defend." At the time the defense was finally formally tendered in

April 2005, it was independently clear for the reasons stated above that General Star had neither the duty to defend or to indemnify.

## V. Conclusion

For the foregoing reasons, the Court concludes that the summary judgment is granted to Hanover, Citizens and General Star and denied to the McFarlane Insureds on all pending motions.[11] Counsel for Hanover and Citizens and counsel for General Star are to lodge forms of order on all motions consistent with this decision for the Court's signature.

So ordered.

**DATED**: March 31, 2008

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

**COPY** of the foregoing mailed by the BNC and/or sent by auto-generated mail to:

Steven H. Schwartz
John D. Briggs
Brown & James, PC
1010 Market Street, 20th Floor
St. Louis, Missouri 63101
Attorneys for Hanover Insurance Company
and Citizens Insurance Company

Michael J. O'Connor
Jennings Strouss & Salmon, PLC
201 E. Washington St., 11th Floor
Phoenix, Arizona 85004-2385
Attorneys for General Star Indemnity Company

Roger W. Hall
Buckley King
2020 N. Central Ave., Suite 1120
Phoenix, Arizona 85004
Attorneys for Hanover Insurance Company and

---

[11]As to any issue raised by any party not specifically addressed in this decision, the Court either sustains or overrules that position, consistent with the overall outcome stated herein.

- 26 -

Case 2:06-ap-00804-CGC    Doc 219    Filed 03/31/08    Entered 03/31/08 12:37:16    Desc
Main Document    Page 26 of 27

Citizens Insurance Company

B. Gerard Cordelli
The Coverage Law Firm, PLLC
1629 K Street, N.W., Suite 802
Washington, D.C. 20006-1637
Attorneys for General Star Indemnity Company

Michael A. Kahn
Geoffrey G. Gerber
Jill A. Wieber Lens
Blackwell Sanders Peper Martin, LLP
720 Olive, Suite 2400
St. Louis, Missouri 63101
Special litigation counsel for Debtor and Debtor-in-Possession
and Attorneys for TMP International, Inc., Todd McFarlane
Productions, Inc., Todd McFarlane Entertainment, Inc., and Todd
McFarlane

Thomas Salerno
Squire, Sanders & Dempsey, LLP
40 N. Central, Suite 2700
Phoenix, Arizona 85004
Attorneys for TMP International, Inc.

Andrew V. Banas
Squire, Sanders & Dempsey, LLP
40 N. Central, Suite 2700
Phoenix, Arizona 85004
Attorneys for Todd McFarlane Productions, Inc.

Dennis E. O'Connell
Bryan Cave LLP
211 N. Broadway, #3600
St. Louis, Missouri 63102
Attorneys for Todd McFarlane Productions, Inc.

Josaefina F. McEvoy
Squire Sanders & Dempsey LLP
555 S. Flower Street, Suite 3100
Los Angeles, California 90071-2300
Attorneys for Todd McFarlane Productions, Inc.

Robert J. Miller
Bryan Cave, LLP
Two N. Central Suite 2200
Phoenix, Arizona 85004
Attorneys for Todd McFarlane

- 27 -